UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**ELECTRONICALLY FILED**

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL ACTION NO. 3:17-CR-00174-DJH |
| SUKHJIT BAINS | DEFENDANT |

### SUKHJIT BAINS'S SENTENCING MEMORANDUM

Defendant Sukhjit Bains has pleaded guilty to being a felon in possession of firearms and to possessing methamphetamine with intent to distribute (*see* Indictment, R.1, Count 1, Page ID # 1-2, and Count 2, Page ID # 2; Plea Agreement, R. 26, Page ID # 54-61), and he comes before the Court in late November to be sentenced.

The plea agreement calls for Mr. Bains to be punished in line with the low end of the applicable Sentencing Guideline range, which the parties agree should correspond to offense level 23, calling for a prison term of 57 months for persons with a criminal history score in Category III. (Plea Agreement, R. 26, at pp. 4-5 ¶¶ 9-10, Page ID # 57-58.) The Presentence Report, however, estimates a final offense level of 27, calling for a term of 87

months.  (PSR, R. 40 at pg. 11 ¶¶ 27-37, Page ID # 153.)  The four-point difference between the two offense level calculations hinges on whether Mr. Bains's conduct merits an enhancement for possessing a firearm "in connection with another felony offense." (*See id.* at ¶ 29 *and* Defendant's Objection No. 4, R. 40-1 at pg. 2, Page ID # 171.)

The Court's task, of course, is not merely to calculate the Sentencing Guidelines correctly, though this is a crucial part of the process; rather, the Court's objective is to find a punishment that is  "sufficient, but not greater than necessary" to accomplish the goals of punishment, 18 U.S.C. § 3553(a), and to this end the Court must look well beyond the Guidelines and take in the entirety of "the nature and circumstances of the offense and the history and characteristics of the defendant." *Ibid.*  Our discussion of this case will therefore begin with the broader field of view and will introduce the Court to Mr. Bains, the person; we will thereafter consider the narrower Sentencing Guidelines question.

* * * * *

More than forty friends and family of Sukh Bains have written letters to the Court expressing their affection and admiration for him and voicing their hope that his prison term will not be severe.  (*See* Letters, attached.)  Emerging from these testimonials is a portrait of a decent and helpful man; a good friend, father, and husband; an outstanding contributor to the

wellbeing of the community (particularly his fellow Sikhs); and one whose abiding concern is the happiness and success of the people around him.

All of this comes in triumph over a terribly difficult childhood. "For as long as I can remember," writes Mr. Bains's sister, "probably from the age of four, life for me and my brother Sukh was like a daily, horrific, nightmare." (Letters at pg. 5.) Physical abuse was sudden, frequent, and violent. "We never knew what abuse we were going to endure from our alcoholic father that day," she recalls:

> I clearly remember my father breaking my mother's nose and on another occasion fracturing my brother's arm. We all had to sleep in one room, with five locks, that on some nights were not even enough to keep our father from beating us. Many nights were spent sleeping in the car in front of our house. Other nights we would awake to police and sirens because the neighbors called the emergency responders after hearing my mother and father fighting.

(*Ibid.*)

To escape the violence, Mr. Bains's mother took the children and moved away. (Letters at pg. 5.) This posed new challenges, writes Mr. Bains's sister. "My mother now had to work two jobs to make ends meet, which left my brother and me on our own most of the time. As a result, my brother Sukh felt like he had to step up

and be the man of the house now.  He was only twelve years old!"
(*Ibid.*)

He carried this burden with a maturity beyond his years,
recalls his sister.

> We did not have much, but my brother was hard-
> working, so while my mother worked to pay bills, he
> got a work-permit to put flyers on cars to earn some
> extra cash to buy the both of us cassettes or candy.
> As he got a little older, he helped my mother by
> working after school at pizza joints.  When he turned
> 18, he could not afford a car, so he got a job at a car
> dealership because they would allow him to drive
> home a company car.

(*Ibid.*)  Adds his mother, "Although Sukh experienced such a rough
childhood, he never allowed myself or his sister to feel any less
than safe with him.  He quickly took matters into his own hands
and became man of the house. He worked very hard in his teenage
years as well as kept school and grades a high priority."  (*Id.* at
pg. 8.)

These qualities of family devotion and endless
industriousness remained constants in Mr. Bains's life from youth
to the present.  The challenges of his young life, and the heavy
exertion required of him, also spawned another continuing theme:
drug use.  "He tried his best to normalize our lives," his sister
writes, but "that kind of life can take a toll on a person."  (Letters
at pg. 5.)  "Eventually," she continues, "Sukh started hanging out

with young men that did not always abide by the law," and in time "he started experimenting with drugs, engaged in fights, lost his job, and frankly, lost his way." (*Ibid.*)

The struggle with drugs was an ongoing ordeal. "He made effort to change, but eventually would resort back to his old ways," his sister writes. (Letters at pg. 5.) "It probably wasn't until his mid-20s that … Sukh finally fought his demons and turned his life around. With hard work and perseverance, he became a successful business man. He did not drink, do drugs, or get into any trouble with the law for at least 15 years!" (*Id.* at pg. 6.)

Mr. Bains's wife, Ravinder ("Ruby"), lauds her husband's determination to "use[] his difficult past as motivation to push him to follow his dreams." (Letters at pg. 1.) He came from California to the Kentuckiana area in the mid-1990's, and despite starting with almost nothing in his pocket, he drove unflaggingly toward becoming a self-made business success. (*Id.* at pp. 33, 43.) A friend writes that "it was Sukh whose hard work, determination, sharp mind, and caring, humble personality led to great ambitions and a very successful business in just a short duration of time." (*Id.* at pg. 35.) Mr. Bains and a friend purchased Shalimar Restaurant in 1999 and built it into one of Louisville's most popular and best regarded dining facilities; in time, Mr. Bains added a grocery, gas stations, liquor stores, and motels to his portfolio of businesses. (*See id.* at pg. 42.) "He created lots of jobs

in Kentucky, Indiana, and Ohio in the times of recessions and made sure people met their basic needs so they didn't have to struggle in rough times," recalls a friend. (*Id.* at pg. 51; *see also id.* at pg. 15.)  A case in point is provided by a former employee, who attests that "[a] few years ago when I was out of work and in a low place, Sukh helped me get back on my feet and offered me a job at his liquor store.  He came to my rescue when I was in need and that's the kind of man Sukh is."  (*Id.* at pg. 27.)  Many who began as entry-level employees in Mr. Bains's enterprises say that he fostered their own eventual success in business, such as this letter writer who worked for Mr. Bains at Shalimar:

> He taught me to give great customer service, manage my time, manage my money, work hard and be more organized. He has taught me how to be very practical and taught me entrepreneurship and small business skills. He has contributed to my work ethic that I possess today that has made me be more successful.

(*Id.* at pg. 12.)  Fellow businesspeople, too, credit their commercial good fortune to Mr. Bains's mentorship. "He helped my family open our first business here," writes one: "It was Sukh that worked alongside us to help us through various day to day operations of our business. … His knowledge and understanding of the business world is what makes him the person he is today. He has helped so many people in the community to open businesses."  (*Id.* at pg. 26.)

Mr. Bains's wife says that he "prioritize[s] others' needs before his own.  If any issue was presented in someone's life (whether it be a total stranger or a close relative or friend)," she continues, "Sukh is always the first one to stand up and make it his mission to meet their needs."  (Letters at pg. 1.)  "He's always been one to strive and provide for others before his own needs," adds his mother.  (*Id.* at pg. 8.)

The attached letters depict Mr. Bains repeatedly extending himself personally and financially for the benefit of others. Sometimes it is a small but memorable gesture, as when he invited the person servicing his store's gas pumps on a freezing day "to come inside the store and have a coffee and warm up," an act of kindness that the writer says "in my industry is rare." (Letters at pg. 7.)  Another writer recalls Mr. Bains coming to his aid when he encountered a problem negotiating a business deal:

> [T]his was at a time in which I had just been newly acquainted with Sukh, but his charismatic personality gave me the confidence to call him for help. I had newly moved to Kentucky, and was facing an obstacle through the acquisition of a business in Louisville. As I was on property, and facing a challenge with the seller of the business, I immediately called Sukh. He took out the time to be on the property with me, and provided assistance as he utilized his business intelligence in handling the current situation. I was amazed that an individual with such an occupied schedule, who I had just been newly acquainted with, took out the time to help me in a place that was

> foreign to me at the time. I believe this deed was done
> out of the good heart that Sukh has, and his striving
> for not only his personal success, but also for the
> success of others.

(*Id.* at pg. 37.)

One particular emphasis in Mr. Bains's "mission to meet others' needs" is schooling. "Education and knowledge is a key factor in Sukh's many morals," his wife writes: "He has guided his nieces and nephews through their entire childhoods," in addition to his own children, "attending teacher conferences or helping out with other schooling needs." (Letters at pg. 2.) The daughter of a business associate recalls that Mr. Bains "went to my parent-teacher conferences in place of my father since he spoke fluent English and understood the school systems better." (*Id.* at pg. 13.) A college professor and friend of Mr. Bains offers another example:

> Sukh's niece was accepted into the MBA program at
> the University of Louisville. At the initiation dinner,
> the incoming student is allowed to bring another
> guest. Having attended many such dinners, students
> often bring their significant other or their parent.
> Sukh's niece had a choice to bring one of her parents
> or one of her brothers. Instead, she chose to bring
> Sukh. In my opinion, she thought Sukh to have had
> more impact on her career than any of the other family
> members.

(*Id.* at pg. 3.) "This ... goes a long way in showing how important Sukh is to the overall well being of not only his immediate family, but also to his extended family," the friend adds. (*Ibid.*)

The foremost example of Mr. Bains's service to the community is his work to create a temple for Sikh worshipers. Prior to 2012, local adherents had to travel to Indianapolis or Cincinnati to participate in religious ceremonies. (*See* Letters at pg. 33.)  Mr. Bains changed that.  "He single handedly led and managed the project to build the first Gurudwara in Kentucky," writes a friend and fellow Sikh.  (*Id.* at pg. 9.)  "The community had been trying to raise funds and have a Gurudwara in the city for years," he writes, "but it was only after Sukh was involved in the project (2011) that, in the matter of a year, … we had a place" to congregate for prayer.  (*Ibid.*)  "[H]e was involved in each and every step, right from buying the property, raising funds and renovation."  (*Ibid.*)  His commitment to the project ran to giving tours of the renovation in progress and advancing personal funds for construction costs.  (*Ibid.*)  "[I]t would not have happened without Sukh's untiring efforts of raising funds and taking necessary initiatives to purchase and renovate the property," writes a member of the Sikh Society of Kentucky.  (*Id.* at pg. 15.)  The temple is now home for about one hundred regular Sunday worshipers, and it hosts some three hundred people on special holidays.  (*Id.* at pg. 16.)  A friend writes that the temple "has allowed our community to not only practice our religion, but to also expand the traditions of our culture." (*Id.* at pg. 37.)  "He promised the community a Gurudwara, which was a

monumentally difficult task, but he made it happen irrespective of all the difficulties and hurdles." (*Id.* at pg. 9; *see also* pp. 25, 26.)

Other examples of Mr. Bains's public service proliferate through the pages of his friends' letters; indeed, as one admirer writes, "Sukh has never left any stone unturned when there came opportunity to help in the community. Whether it be helping under-privileged families or sharing his knowledge to help families with work business opportunities[, h]is motto has always been 'sharing is caring.'" (Letters at pg. 28.) So, for instance, Mr. Bains helped organize the Punjabi Cultural Society of Kentucky, a group dedicated to providing a home for experiencing authentic Punjabi life. (*Id.* at pg. 3.) He donated bottled water from several of his stores to a friend's charitable event, which the friend says "may not seem like much, but it meant the world to me that he would go out of his way to help a friend with something he wasn't even involved in." (*Id.* at pg. 7.) He devoted many hours to working on the Kentucky Derby Festival's board of directors, and spearheaded the effort to persuade one of his franchisors, Valero Energy, to become a primary sponsor of Thunder Over Louisville. (*Id.* at pg. 24.) He has committed substantial time and money to Shalimar's annual role in the "Taste of Innovation" fundraiser for Louisville's international IdeaFestival program, including one year when, an organizer recalls, "he was short staffed for multiple reasons. He could have cancelled his commitment, but he did not," she writes.

Instead, Mr. Bains "followed through and worked the event himself. He was always the most popular restaurant participant and always had the longest line." (*Id.* at pg. 29.)  The co-founder of "Unbridled Eve," a Derby-related charitable event that raises money for Blessings in a Backpack and other worthy causes, also praises Mr. Bains's involvement:

> When I first approached Sukh with some of the charity needs in relation to raising money for our 501c3 beneficiaries, Sukh immediately went above and beyond, and gave dozens of hours of his personal time and thousands in financial contribution, not only in cash but also through items he personally secured and donated to our auction. He gave invaluable business counsel in relation to protecting the charity and structure. He has a giving heart and nature, and our community has benefited from his being a part of it.

(*Id.* at pg. 20.)  The March of Dimes and Doctors Without Borders also count Mr. Bains among their dedicated supporters.  (*Ibid.* and *id.* at pg. 54.)  "I can draw a specific line to his impact that will last for generations," a friend avers.  (*Id.* at pg. 20.)

Mr. Bains's devotion to his family is even stronger than his concern for the community.  "He is a hero to his children and lives for their love and affection," writes his attorney and friend: "Their success and happiness is Sukh's primary motivating factor and he would do anything for them." (Letters at pg. 14.)  "[A]nytime his son or daughter had a performance in any Indian social event he would be present during the whole function to cheer his kids and

provide moral support," says another friend.  (*Id.* at pg. 10.)  At his children's schools, writes a fellow parent, "There has never been a single event/ceremony that Sukh has missed."  (*Id.* at pg. 28.)  "We have always seen Sukh very involved in his kids' life," the writer continues: "He has volunteered to help with multiple school projects including beautification of the schools and contributing to many important school decisions.  He was very influential to the kids, demonstrating the perfect entrepreneurship skills that he attained."  (*Ibid.*)  A friend adds that, at social and cultural events in which Mr. Bains's children participated, "one could see the pride and joy on his face when his kids used to perform. He was right in the front making videos, taking pictures and hugging his kids – his wife and mom by his side."  (*Id.* at pg. 32.)

Mr. Bains's remorse for his crime has been evident to his friends.  "My expectations that Sukh would own up to his mistakes was based upon his dealings and friendship with me," writes one friend, "[s]o it comes as no surprise that he did."  (Letters at pg. 24.)  "I believe that he understands fully what the consequences are and that he has definitely learned a lesson," continues the friend, who says with certainty that Mr. Bains "will return to the public knowing that he has to behave in a manner consistent with the laws of our country."  (*Ibid.*)  "I believe without a doubt that Sukh realizes his shortcomings and wrongdoings," writes another friend, "and that his intention is never to do [wrong]

again." (*Id.* at pg. 30.) "[H]e **has** realized his shortcomings," concurs another supporter, who affirms that Mr. Bains "has strong will and desire to repent...." (*Id.* at pg. 36 (emphasis in original).) One letter-writer sums up the matter eloquently:

> I believe strongly in our legal system and understand there needs to be accountability for a person's actions. I also know that taking personal responsibility is not something that comes easily to most, but I can also tell you with sincerity that Sukh understands and accepts full responsibility for his actions. He is not blaming others, and I know with all my heart that he will not repeat any past actions or make the wrong decision.

(*Id.* at pg. 20.)

* * * * *

The Presentence Report asserts that Mr. Bains possessed a handgun "in connection with" his drug trafficking offense, and thus accords a four-point enhancement to his offense level under USSG § 2K2.1(b)(6)(B). (PSR, R. 40 at pg. 11 ¶ 29, Page ID # 153.) The Court should remove this enhancement from Mr. Bains's Guidelines calculation. (*See* PSR Addendum, R. 40-1 at pg. 2 Objection No. 4, Page ID # 171.)

Mr. Bains began a state diversion program on February 3, 2017, in the hope of resolving a methamphetamine-possession charge pending against him in Jefferson Circuit Court. (PSR, R. 40 at pg. 15 ¶ 47, Page ID # 157.) He had permission to leave confinement so he could work at his businesses, and his diversion

program went forward without incident until the night of
February 15, when he failed to report back to jail in time for
curfew.  (*Id.* at pg. 6 ¶ 14.)  (As he informed the authorities early
the next morning, he had fallen asleep at his desk and slept
through the jail's deadline.)  Mr. Bains was arrested on
February 17 after officers found him waiting in a rented car
outside an acquaintance's home.  (*Ibid.*)  The arresting officers
found a small amount (30.3 grams) of methamphetamine in Mr.
Bains's pocket; in a search of the automobile, they found a
handgun in the pocket behind the front passenger seat.  (*Ibid.*)   In
a second inspection of the vehicle about a month later, police
found a hollow shaving cream can within a black book bag; inside
the can was a package with 19.7 grams of cocaine.  (*Ibid.*)

 Mr. Bains has proffered through counsel that he was
planning to share the drugs with a friend, not sell them in a
commercial transaction, when police arrested him in February
2017.  (PSR Addendum, R. 40-1 at pg. 1 Objection No. 1, Page ID #
170.)  The firearm had no connection to the drugs: Mr. Bains "has
had a Carrying Concealed Deadly Weapon permit for approximately
ten years because all of his businesses heavily rely on cash
purchases," and therefore "frequently has to take large amounts to
cash to the bank and deposit and withdraw large amounts of cash
from ATMs."  (*Id.* at pg. 5.)  He accordingly "always had a firearm
with him," and his possession of the weapon when he was arrested

was a consequence of that deeply-ingrained habit, not the product of a plan to conduct a drug transaction. (*Ibid.*) It was for this reason that counsel for the defense and government had not deemed the enhancement appropriate when they analyzed the Sentencing Guidelines during preparation of the plea agreement. (*See id.* at pg. 5 ¶ 7, Page ID # 147.)

The Presentence Report finds cause, based on the combined presence of the gun and drugs when Mr. Bains was arrested, to recommend that the Court add four points to Mr. Bains's offense level under USSG § 2K2.1(b)(6)(B). That Guidelines provision worsens an offender's punishment if he "used or possessed any firearm … in connection with another felony offense…." (PSR, R. 40 at pg. 11 ¶ 29, Page ID # 153.) It is designed to lengthen a defendant's prison term in cases where a "firearm … facilitated, or had the potential of facilitating, another felony offense." USSG 2K2.1 cmt. n. 14(A) (2017). The "other felony offense" in the present case is, in the Presentence Report's view, Mr. Bains's possession of a controlled substance with the intent to distribute the drug; the chief consideration in our case, as in all cases studying § 2K2.1(b)(6)(B)'s applicability, is "the relationship between the [firearm] offense and the other offense, consistent with relevant conduct principles." *Id.*, cmt. 14(E).

That relationship is all-important, the Sixth Circuit has explained. *United States v. Jackson*, 877 F.3d 231, 237-243 (6th

Cir. 2017). The court observed that the enhancement is warranted "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs," *id.* at 237 (quoting USSG § 2K2.1 cmt. n. 14(B)(ii)), but "[o]n the other hand," the court specified, "possession of firearms that is merely coincidental to the underlying felony offense is insufficient to support the application of the enhancement...." *Ibid.* (quoting *United States v. Taylor*, 648 F.3d 417, 432 (6th Cir. 2011)). "In other words," the court continued, "there must be (and thus the Government must prove by a preponderance of the evidence) 'a clear connection between the gun that served as the basis for the conviction for felon in possession of a firearm and the gun possessed during the other offense that triggers the enhancement.'" *Ibid.* (quoting *United States v. Goodman*, 519 F.3d 310, 322 (6th Cir. 2008)).

The presence of a gun in "close proximity" to drugs evokes the presumption underlying the "fortress theory," which the Sixth Circuit calls a "close relative" to the proximity rule: namely, "the commonsense rationale that drug transactions are potentially dangerous, ... and thus that keeping guns near one's drugs might not only serve to protect the drugs, ... but might also embolden the offender to carry a large amount of drugs, to show up at a location where the parties on the other side of the transaction are armed, and to ensure that both the money and the drugs change hands." *Jackson*, 877 F.3d at 239 (punctuation and citations omitted). But

a firearm in the vicinity of drugs does not invariably fit within this "commonsense rationale:" in circumstances where the defendant has "only a small amount of drugs in his possession" and, though engaged in trafficking, he is not "purposely keeping together … guns and drugs," *see id.* at 240, the sentencing enhancement is not warranted.

Our case offers precisely the circumstances where a gun, though in proximity to drugs, did not facilitate a drug trafficking transaction and was not purposely kept to facilitate a potential sale. When Mr. Bains was found in his car, he was not in the process of making a drug deal or about to engage imminently in a sale; he had controlled substances in his possession, but he had no intent or plan to sell them to anyone; he had a firearm in his possession, but it was not because he wanted to "ensure that both the money and the drugs change[d] hands," *cf. Jackson,* 877 F.3d at 239, or because he was "embolden[ed] to carry a large amount of drugs," *cf. ibid.*, or because he wanted to coerce a buyer into making a deal "to ensure that the [drugs] were not purchased from a competitor," *cf. id.* at 241, or because he planned to include the firearm as part of the transaction to "sweeten the pot," *cf. ibid.* The presence of the gun in the car was by dint of settled habit, a habit reflecting decades of Mr. Bains's experience with the risks of operating cash-intensive businesses. The firearm's proximity was therefore entirely incidental to the drugs in his possession.

What the Sixth Circuit concluded in *Jackson* applies equally here: "[Bains] made many bad decisions as part of the events giving rise to this case, and he is paying the price for them.  But the conduct at issue does not justify the conclusion that [he] made the additional bad decision of 'using or possessing any firearm or ammunition in connection with' his drug trafficking offenses." *Jackson*, 877 F.3d at 243.  The Court should not increase Mr. Bains's advisory prison term pursuant to § 2K2.1(b)(6)(B).

\* \* \* \* \*

Compared to other federal defendants, Sukhjit Bains's profile is, at least superficially, rather ordinary.  He has pleaded guilty to illegal gun possession and drug dealing, two of the more common crimes prosecuted in the United States District Courts; he has a checkered criminal record; he is a little older than the typical federal defendant, perhaps, but relatively young and generally healthy, like most who are sentenced in federal court.[1]

Beneath these surface commonalities, though, almost nothing about Mr. Bains fits the pattern, as demonstrated in myriad ways by the letters from Mr. Bains's friends and family.  He has been gainfully employed his whole life – indeed, has created dozens of jobs in the local economy; he has weathered financial

---

[1]    *See* U.S. Sentencing Comm'n, *2017 Sourcebook of Federal Sentencing Statistics*, Figure A and Tables 6 and 20 (22nd ed. 2017), available at https://www.ussc.gov/research/sourcebook-2017.

hard times without ever leaning on social aid or taxpayer support; he has profoundly enriched the Sikh community, and has generously supported many other charitable causes, all his adult life. Very few criminal gun owners or drug dealers can attest to any of that.

Mr. Bains's offenses were not those of a man committed to a criminal livelihood. Unlike many felons in possession of firearms, Mr. Bains was not maintaining an arsenal for future wrongdoing; unlike nearly every drug trafficker ever sentenced in federal court, Mr. Bains was not in the business of selling drugs and, indeed, had no plans to sell the drugs that were found in his possession when he was arrested. These distinctions make little difference to a defendant's Guidelines calculation, but they make all the difference when assessing his likelihood of recidivism: Mr. Bains's unusual circumstances show that he was not pursuing a life of crime when he committed his offenses, and augur strongly that he will not embark on a life of crime when his prison term is complete. Mr. Bains's personal history demonstrates instead that he will quickly and successfully resume his life's work the first moment he regains his freedom, and in so doing will bestow an unalloyed benefit on his community.

Sukhjit Bains is a man "who would do most anything for anyone" (Letters at pg. 7), a man who is "genuinely one of the most giving and selfless people" in the community. (*Id.* at pg. 13.) The

sooner he can return to his family and friends, the better for society.  Mr. Bains humbly asks the Court to impose the shortest possible prison term that will be sufficient to satisfy the Court's sentencing obligations.

Respectfully submitted,

*Scott C. Cox*

Scott C. Cox

*Michael R. Mazzoli*

Michael R. Mazzoli
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MazzoliCMLaw@aol.com

*Stephen B. Pence* [by permission granted]

Stephen Beville Pence
Pence & Whetzell, PLLC
9300 Shelbyville Road, Suite 1205
Louisville, KY 40222
502-736-6200
steve@pencelegal.com

*Rob Eggert* [by permission granted]

Rob Eggert
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
tlyons@600mainlaw.com

## CERTIFICATE OF SERVICE

On November 16, 2018, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*

Michael R. Mazzoli